# JAMES MEEHAN Jr. v. JOHN P. MEEHAN and Another.[1]

July 19, 1912.

Nos. 17,644—(163).

**Abuse of discretion to deny new trial — preponderance of evidence against verdict.**

Appeal from an order denying appellant's motion for judgment notwithstanding the verdict or for a new trial, in an action against the executors for the value of personal services rendered by respondent to their testator. *Held*, that the motion for judgment was correctly denied, but that it was error to deny the motion for a new trial because of error in the admission of evidence, and for the reason that the verdict was so manifestly against the preponderance of the evidence that it was an abuse of discretion not to submit the case to another jury.

From an order of the probate court for Red Lake county allowing James Meehan's claim for $10,450 against the estate of Patrick Meehan for services rendered, John P. Meehan and Michael Carpenter, as executors of the estate of Patrick Meehan, deceased, appealed to the district court for that county. The appeal was heard before Watts, J., and a jury which returned a verdict in favor of plaintiff for $8,200. From an order denying their motion for judgment notwithstanding the verdict or for a new trial, the executors appealed. Reversed and new trial granted.

*Stanton & Rowberg, Charles E. Boughton* and *John J. Maher,* for appellants.

*Greeley E. Carr* and *F. A. Grady,* for respondent.

Start, C. J.

The respondent herein presented a claim against the estate of his uncle, Patrick Meehan, deceased, and the executors thereof appealed from an order of the probate court allowing the claim to the district court of the county of Red Lake.

[1] Reported in 137 N. W. 163.

The complaint in the district court alleged that between January 1, 1900, and September, 1908, the plaintiff, at the request of Patrick Meehan, hereinafter referred to as the deceased, performed work and services for him which were of the reasonable value of $10,450. The answer denied the allegations of the complaint, except as therein admitted, and alleged a full accounting and settlement by the parties of all matters between them including the services alleged in the complaint, on September 1, 1908, and that there was found due to the deceased the sum of $2,600, no part of which had been paid, except $2,000, leaving a balance due to the deceased of $600, which was evidenced by the respondent's note to him for that amount. The answer demanded judgment in favor of the executors for $600 and interest. The reply put in issue the alleged settlement and accounting, but admitted the execution of the note, and alleged an agreement for the cancelation thereof upon certain alleged conditions, and that those conditions had been performed.

The issues were submitted to the jury, and a verdict returned for the respondent in the sum of $8,200. The executors appealed from an order denying their motion for judgment notwithstanding the verdict or for a new trial. Their assignments of error are to the effect that the trial court erred in denying their motion for a directed verdict in their favor and in denying their motion for judgment; that it erred in denying their motion for a new trial, because the verdict is not sustained by the evidence; and, further, that it erred in its rulings as to the admission of evidence and in its instructions to the jury.

The evidence is practically undisputed that from 1890 to 1900 the deceased and his brother James Meehan, the father of the respondent, as copartners, carried on an extensive logging and mill business at Thief River Falls, Minnesota, and that during the time stated the respondent was in the employ of the firm; that about January 1, 1900, the firm sold their business, but the firm notes and accounts were taken over by the deceased, and were left by him in the hands of the respondent, who continued to reside at Thief River Falls, to collect for the deceased; that he did collect and account for some $15,000; and, further, that the respondent continued to reside at Thief River Falls until 1903, and that from the years 1900 to 1907 he was largely

interested in real estate transactions and business in that city on his own account. The evidence tends to show that during the time stated the respondent was requested to and did look after other business matters for the deceased, especially his real estate and his lawsuits. The making of such collections and attending to such other matters for the deceased were the basis of respondent's claim against the estate of his uncle.

The executors introduced on the trial documentary evidence which, to say the least, strongly supported their contention that all services rendered by the respondent to the deceased for which it was intended by either party that compensation should be made were fully settled and adjusted between them as alleged in the answer. It appears from the documentary evidence that in January, 1905, the respondent rendered a statement of account to the deceased, the first debit item of which was this:

"Jan. 1, 1904.        To Bal. Statement Rend.,        $85.38."

And the last one was:

"Jan., 1905.   6 months' work May, June, July, Aug. Sept. Oct.
$600."

Making the total debit $1,129, which, less $110 credit, left a balance due to the respondent of $1,019, which was paid, and he receipted for it January 7, 1905.

His letters to his uncle, which were received in evidence, show that he was indebted to him for borrowed money, during the time that the services for which he claims compensation were rendered, which he was anxious to pay, but was unable to do so.

On May 1, 1905, he wrote to his uncle as follows: "I enclose you a draft for $500. I will have the balance of what I owe you in a few days. I should have sent this sooner, but had to buy the two lots in Thief River. * * * "

On December 7, 1905, he wrote: "I will need about $2,000 to close up my building operations. * * * I enclose you a note for $2,000. If you have the money on hand, and want to let me have it, all right; if not, you can send the note back."

On May 13, 1906, he wrote: "I expected to have that money before now, but have been disappointed in making a sale that I thought sure

was going through. I have, however, good prospects of having the money inside of two weeks, and will remit to you at once."

On July 27, 1906, he wrote: "I am sorry to keep you waiting for the money. I expect to sell the house I have just built here next week, and will send you part or all of it then. I haven't been making much money the past six months and have been unable to sell anything. I am getting in shape now, so you won't have to wait much longer."

On August 28, 1906, he wrote: "This debt to you has worried me continuously. If I had any luck in selling anything, as I expected when I borrowed it, I would have paid you when it was due."

On September 22, 1906, he wrote: "As you are interested to the extent of $2,000 in my financial welfare, I thought best to write you and explain I had just about completed the sale of nine quarters of father's land at $300 above the prices he put on the land. This would have made me a profit of $2,700. Father came * * * to-day and took the land out of the market. * * * I had everything in good shape to sell all the land at a profit of $600 to him. He is not satisfied, but places me in a position where I have to go asking for favors or go into bankruptcy. If I had your debt paid, I wouldn't care for anything else. * * * Whatever happens, you can rest assured you will get your money as soon as I can get it."

It is true, as counsel for respondent claims, that the account stated in January, 1905, does not contain any charge for services, except for the months therein specified. If, however, the respondent had rendered other services to his uncle during five years next before the statement was rendered, for which he expected to charge and which had not been adjusted, why were they not included in the statement? Again, if his uncle was owing him for services more than $10,000, as he now claims, why was he borrowing money from him? Why did he write the letters to which we have referred? Why did he wait until his uncle was dead before making the claim? The only possible answer to these questions is that suggested by his counsel in their brief: "He borrowed different sums of money from the deceased, and, believing that his uncle was going to provide for him substantially in his will, did not wish to antagonize him by asking for a settlement, or to have it applied upon the amount due him for services.

In fact, every letter or act of the plaintiff shows that he expected to be paid for these services by a bequest in his uncle's will, and that as soon as the will was admitted to probate this plaintiff took the only and proper steps to protect his claim."

There was evidence tending to show that the deceased stated to a third party that he was going to do well and substantially by the respondent in his will, and that this was told to respondent, and, further, that deceased said in effect to another person that he would take care of the respondent when the time came; but this was stricken out, because it was never communicated to the plaintiff. Nevertheless the person to whom this statement was made was permitted, over the appellant's objection, to testify as to what he said to the respondent, in these words:

"You as a young man have got a good chance, I says; if you do not antagonize your uncle, he may do well for you in years to come; it would pay you to keep good friends with him."

This was simply gratuitous advice, there being no suggestion to the plaintiff as to what his uncle had said. It was error to admit the evidence, as it was incompetent and prejudicial. The evidence, however, as to what the deceased said with reference to providing in his will for the plaintiff, was correctly received in evidence, because it was communicated to the plaintiff, and was a circumstance of some significance, which the jury might properly consider in connection with the evidence as to the delay of the plaintiff in asserting his alleged claim.

While the evidence tending to show that the plaintiff kept silent as to his alleged claim, while his uncle was living, because he expected to be provided for in his will, is far from satisfactory, yet there is some evidence tending to support the verdict.

It follows that the trial court did not err in denying the appellant's motions for a directed verdict and for judgment notwithstanding the verdict. A consideration, however, of the entire record, leads us to the conclusion that the verdict is so manifestly against the great preponderance of the evidence that the trial court ought, for this reason and for error in receiving evidence, to have granted a new trial,

and that its refusal to do so and to submit the case to another jury was an abuse of discretion.

We find no reversible errors in the rulings of the trial court on the admission of evidence as to the value of the plaintiff's services. The instructions to the jury assigned as error were substantially correct.

Order reversed, and new trial granted.